UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROSALIND CROSS,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )
                                   )        No.    4:13 CV 02338 JMB
DAVID S. FERRIERO,                 )
Archivist of the United States,    )
National Archives and Records      )
Administration,                    )
                                   )
            Defendant.             )

## MEMORANDUM AND ORDER

Plaintiff, Rosalind Cross, an employee of the National Archives and Records

Administration ("NARA"), brings this action pursuant to 42 U.S.C.§ 2000e, *et seq*., alleging that

Defendant NARA, acting through the National Personnel Records Center ("NPRC") Director,

Ronald Hindman, and her supervisor, Chief of Management Systems Staff, Deborah Hilton,

discriminated against her on the basis of race and color.   Plaintiff alleges seven claims of

disparate treatment and retaliation and seeks four million dollars in damages.   (ECF No.1, at

37-38)

Now before the Court are Defendant's Motion to Dismiss, or Alternatively, for Summary

Judgment (ECF No. 26), and Plaintiff's Motion for Summary Judgment, or Alternatively, a

Referral to ADR.   (ECF No. 29)   The Court has jurisdiction over the matter through the consent

of the parties pursuant to 28 U.S.C. §636(c). The motions are fully briefed; and for the reasons set

forth below, Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment is granted,

and Plaintiff's Motion for Summary Judgment or Alternatively, a Referral to ADR is denied.

# I.    <u>Procedural History</u>[1]

On November 4, 2008, Plaintiff was notified that she had not been selected for either of two open positions for which she had applied.   On November 20, 2008, Plaintiff filed an anonymous complaint with NARA's Equal Employment Opportunity Commission (EEOC) Office alleging several claims of discrimination on the basis of race and color, including the fact that she was not selected for one of the open positions. (Defendant's Statement of Material Uncontroverted Facts ("DSOF") at ¶5, ECF No. 28)[2]   Thereafter, at some point in December of 2008, she identified herself as the EEOC Complainant.   (ECF No. 27-9 at 40)

On January 2, 2009, Plaintiff received notice of her right to file and filed a formal complaint of discrimination with NARA's EEOC Office.[3]  (ECF No. 1 at 8 & 70)   On February 25, 2009, NARA initiated an investigation of the following issues raised by Plaintiff's complaint: whether Plaintiff was discriminated against on the bases of race (African American) and/or color (dark skin tone) when, (1) on or about November 4, 2008, she was not selected for a GS-12 management analyst position; (2) in November, 2008, NARA denied her request for a desk audit; and (3) NARA retaliated against her for filing EEOC complaints.   The investigation also focused on Plaintiff's allegations that her supervisor, Ms. Hilton, retaliated against her for engaging in protected activity by: (1) including inaccurate statements in her performance evaluation for the

---

[1] Because of the procedural posture of this case, in its discussion of any factual matters, the Court will either refer to uncontroverted facts, or construe any facts that are in genuine dispute in favor of the non-movant. <u>See</u>, Fed. R. Civ. P. 56(c); <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009).
[2] The Court deems all of the facts stated in Defendant's Statement of Uncontroverted Material Facts to be admitted, because they were not disputed by Plaintiff in accordance with local rule. <u>See</u>, Local Rule 7-4.01 "All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."
[3] Although the EEOC opinion stated that Plaintiff filed her formal complaint on January 29, 2009, (ECF No. 1 at 8), the record establishes that she filed her formal complaint of discrimination on January 2, 2009.   (ECF No. 27-4 at 24)   The discrepancy is not material here because NARA does not raise the issue of timeliness as a defense.

period covering October 1, 2007, through September 30, 2008; and (2) asking her to perform assignments at the GS-12 level without a compensating her at the corresponding pay grade.[4] (Id. at 8-12); (ECF No. 27-5 at Gov112). On June 29, 2009, NARA issued its Report of EEOC Investigation regarding Plaintiff's allegations. Plaintiff then requested and was granted a hearing before an EEOC administrative judge (AJ).[5] (ECF No.1 at 69-70); (ECF No. 27-4 at Gov1-17).

Following the EEOC hearing, the AJ issued a decision finding that NARA did not discriminate or retaliate against Plaintiff on the basis of race or color. The AJ concluded that Plaintiff had neither established that she actually performed duties corresponding to a higher pay grade nor been harmed by the alleged delay in responding to her requests for a desk audit and corrections to her position description. (ECF No.1 at 80-81) With regard to the claim that Ms. Hilton made inaccurate statements in Plaintiff's performance evaluation in retaliation for Plaintiff's filing of an EEOC complaint, the AJ found that the Ms. Hilton had no knowledge of Plaintiff's EEOC filing at the time that Ms. Hilton completed the performance evaluation. (Id. at 9, 67 & 82) Plaintiff appealed this decision, and on August 23, 2013, the EEOC Office of Federal

---

[4] The NARA EEOC Office did not investigate Plaintiff's claim alleging "[d]iscriminatory hiring and promotion practices at the Agency and NRP," because that claim involved persons other than Plaintiff. The NARA EEOC Office informed Plaintiff that this allegation would be treated as a class action complaint and provided her with directions for pursuing the claim. (ECF No. 27-5 at Gov112-13).

[5] On October 16, 2009, Plaintiff sought to amend her complaint to include an allegation that the NARA EEOC Office had discriminated and retaliated against her in its handling of her underlying agency EEOC complaint and to add allegations regarding failure to train, "failure to rate fair and honest," and "unfair scope and responsibilities." On November 5, 2009, the EEOC denied Plaintiff's motion to amend because Plaintiff had failed to set forth any information from which the administrative judge could determine if either proposed amendment would be proper. (ECF No. 27-8) Further, the EEOC found that the allegations in Plaintiff's existing complaint— non-selection, denial of a desk audit, higher level work without higher level pay, and inaccurate statements in a performance evaluation— encompassed the allegations of "failure to rate fair and honest" and "unfair scope and responsibilities" she sought to add to her complaint. (Id.) For these reasons, the AJ denied Plaintiff's motion to amend her complaint. (Id.)

Operations affirmed the Agency's Final Order implementing the decision of the AJ. (Id. at 8-12)

Plaintiff filed the present lawsuit on November 21, 2013. (Id. at 1) In her complaint Plaintiff sets forth seven counts. Plaintiff alleges discrimination on the basis of race and color arising from the following conduct by NARA: (1) failing to promote Plaintiff to either of the two open GS-12 positions, and selecting white candidates to fill those positions (Counts I and II); (2) assigning Plaintiff "GS-12 projects" but compensating her at the GS-11 pay grade (Count III); (3) failing to give Plaintiff a timely position description review, and/or to reclassify and upgrade her position (Count IV); (4) a "failure to rate fair and honest," premised upon the delay of her 2007 performance evaluation (Count V); (5) sending only white employees to out-of-town information technology training sessions (Count VI); and (6) assigning fewer and less demanding projects to similarly situated white, GS-11 employees than to Plaintiff (Count VII). (Id. at 4, 14, 16, 26-37). In addition, Plaintiff alleged before the EEOC and apparently asserts here, that Ms. Hilton, in retaliation for Plaintiff's filing of an EEOC complaint, included inaccurate statements in Plaintiff's 2008 performance evaluation.[6] (ECF. No. 27-2 at GOV444-53); (ECF. No. 27-11 at 23-24).

## II.     The Facts[7]

Plaintiff, an African American of darker skin tone, has been employed at the NARA facility in St. Louis, Missouri, since 1984 and has been a GS-11 management analyst since approximately 1999. Ms. Hilton, who is white, supervised Plaintiff from 2004 through December, 2010. During the relevant time period only two of the GS-11 management analysts in the St. Louis office were African Americans. The other African American employee, Ms. Wills,

---

6    Although this retaliation claim is not readily apparent from the face of Plaintiff's present complaint, the Court, taking into consideration Plaintiff's pro se status, will consider her factual allegations to constitute a charge of retaliation.

7    As noted above, because the Court is ruling on a motion for summary judgment, in its discussion of factual matters, the Court will either refer to uncontroverted facts, or will construe any facts that are genuinely in dispute in favor of the non-movant.

has a lighter skin tone than Plaintiff. During that same time period, Ms. Hilton reported to Mr. Hindman, the Director of NPRC. (ECF No. 1, at 70).

### *A.*    *Failure to Promote to the GS-12 Management Analyst Position (Counts I and II)*

On or about May 16, 2008, NARA posted two job openings for GS-12 management analysts. (Id. at 70). The persons hired would report to Ms. Hilton, and she was responsible for the hiring decision. The job description for GS-12 management analyst included the following duties:

    a.  Plan and conduct studies of and surveys of NARA activities,
    b.  Develop operating improvements and techniques; and
    c.  Serve as the functional expert and test agent in the development of new NARA procedures.

(DSOF at ¶25)

Ms. Hilton testified that, in addition to these requirements, she sought individuals with excellent written and oral communication skills and strong problem-solving abilities. She also testified that she sought candidates who exhibited initiative, self-motivation, tact, and diplomacy. Ms. Hilton further explained that analytical skills relevant to all areas of the agency, a broad range of experience with information technology systems, and experience with staffing and billing were also important characteristics for successful performance in the open positions. (DSOF at ¶28; ECF No. 27-2 at Gov536 to Gov537).

Plaintiff was one of six individuals chosen from a larger pool of applicants to be interviewed. (ECF No. 1 at 71) The interviews were conducted by a three-person panel, which consisted of two GS-12 management analysts; Kevin Schumaker, a white male, and Mary Wills, a black female; and Plaintiff's supervisor, Ms. Hilton, a white female.[8] (ECF No. 27-2 at

---

[8] In testimony at the administrative level, Plaintiff conceded that two members of the selection panel, Mr. Schumacher or Ms. Wills, did not discriminate against her on the basis of race. (ECF

Gov535-36).

Ms. Hilton prepared the questions for the interviewees, and the panel asked the same questions of each candidate.[9]   (ECF No. 27-2 at Gov536-538; DSOF ¶30).   After interviewing the six candidates, the panel members independently ranked the candidates and then met to discuss their rankings.   (ECF No. 27-2 at Gov539 to Gov540).   The panel members ranked Plaintiff and the two individuals ultimately selected for the positions, Robert Marsh and Joseph Stewart, as follows:

- No panel member ranked Plaintiff higher than the two successful candidates. (ECF No. 1 at 71)
- All three panel members ranked Mr. Marsh first, and no panel member ranked Plaintiff among the top three candidates.   (Id.).
- Ms. Hilton and Mr. Schumaker both ranked Mr. Stewart second and Plaintiff last.
- Ms. Wills ranked Mr. Stewart fourth and Plaintiff fifth.   (Id.).

Mr. Marsh, the top-rated candidate for the position, was a retired United States Army Colonel and had previously commanded the Army Human Resources Command with a staff of more than 1,300 employees and a budget of over $1 billion.   Ms. Hilton surmised that, in his prior position, Mr. Marsh may have had more supervisory and financial responsibility than the director of the NPRC.   Although Mr. Marsh was not an internal candidate, Ms. Hilton observed that he was already very familiar with NARA because the Army Human Resources Command operated out of the same building as NARA and performed similar work, in particular, the storage and servicing of personnel records.   Ms. Hilton characterized Mr. Marsh's written communication skills as "outstanding" and his oral communications skills as "excellent." (DSOF at ¶¶41-44)

The other highly rated candidate, Mr. Stewart, had been employed by NARA for

---

No. 27-2 at Gov454).
9      Internal candidates also were asked to describe any self-development activities in which they had engaged since their prior attempts, if any, at attaining promotion to the rank of GS-12. (DSOF at ¶31).

approximately three years at the time of the selection process. Mr. Stewart exhibited "excellent" written and "good" oral communication skills, came to NARA with private sector management experience, and had experience at NARA in both business analysis and project implementation. During his tenure at NARA, Mr. Stewart received "outstanding" performance evaluation ratings. Mr. Stewart had been a management intern with NARA over several years and had rotated through different NARA departments where he had demonstrated an ability to create reports and analyze the reported data, as well as a proficiency in working with Siebel, a software application used by NARA. At the time of the interview, Mr. Stewart was performing extensive analysis for a project in which NARA would move four million boxes from one St. Louis facility to two other facilities. (ECF No. 27-2, Gov541 to Gov545).

It is undisputed that Plaintiff had more years of experience at NARA than either Mr. Marsh or Mr. Stewart. However, Plaintiff's oral and written communication skills were not deemed as strong as those of either Mr. Marsh or Mr. Stewart. In addition, Plaintiff had not interviewed "very well," and Ms. Hilton testified that it was difficult for the interviewers to determine from Plaintiff's responses whether she had the initiative and risk-taking skills Ms. Hilton thought were important for the job. Finally, Plaintiff's work performance had consistently been rated "highly successful" rather than "fully successful" or "outstanding." (Doc No. 27-2 at Gov545 to Gov547). On the basis of the interviews and the recommendations of the panel, Ms. Hilton selected Joseph Stewart and Robert Marsh, both of whom are white, to fill the open positions.

Plaintiff argues that Mr. Marsh and Mr. Stewart were each less qualified than she "in every area . . . ." (ECF No. 27-9 at 21). The record establishes, that Plaintiff had more years of experience at NARA and that her associate's, bachelor's, and master's degrees in business and management were arguably more relevant to the position than either Mr. Stewart's or Mr. Marsh's

degrees, in history and criminal justice, respectively.   In addition, it is undisputed that Plaintiff had more NARA-specific information technology "classroom hours," and more experience than either of the successful candidates with NARA's "legacy" information technology systems, and with "ARCIS," the successor information technology system, that was being phased in at the time of the selection process.   (ECF No. 1 at 72); (ECF No. 27-9 at 16-18).

After acknowledging that Plaintiff had more years of experience with NARA and that her education was arguably more relevant to the position, Ms. Hilton testified that these factors were less important for successful performance as a GS-12 management analyst than the strong written and oral communication skills and evidence of initiative and experience in analyzing business operations that she observed in the successful candidates.   (ECF No. 1 at 72-73); (ECF No. 27-2 at Gov556-71).   The record further indicates that Ms. Hilton was not seeking a candidate with expertise in a particular software application.   Although Ms. Hilton acknowledged that Plaintiff had more experience than the other candidates with ARCIS and with the legacy NARA systems, she emphasized that, in terms of systems experience, she was looking for "some indication that the candidate had knowledge of writing business requirements and identifying how IT systems would be used in operations."   (Doc No. 27-2 at Gov546)

The record also indicates that at the time of the selection process, Ms. Hilton had supervised Plaintiff for approximately four years and possessed personal knowledge of Plaintiff's work and abilities. She testified that this knowledge led her to conclude that Plaintiff did not have strong skills in either "writing business requirements" or in "identifying how IT systems would be used in operations."   (Id. at Gov545-46).

Plaintiff testified that in light of her superior qualifications, Ms. Hilton's failure to select her could only be explained as "discriminatory."   In the alternative, Plaintiff testified that the

selection process had been "rigged" and that Mr. Marsh and Mr. Stewart had been "pre-selected" for the positions.   In some instances, she testified that she did not know why Mr. Marsh and Mr. Stewart had been "pre-selected."   (ECF No. 1 at 72)

### B.    *Work Assignments and Grade Level (Counts III and VII)*

With respect to Plaintiff's allegation that she had been required to perform the duties of a GS-12 management analyst without receiving the concomitant pay, it is undisputed that Ms. Hilton often assigned to Plaintiff and other GS-11 analysts duties that previously had been performed by GS-12 analysts.   See (DSOF at ¶¶91, 92).   Ms. Hilton and Mr. Hindman both testified that Ms. Hilton re-assigned these GS-12 duties or projects, to Plaintiff, to other GS-11 employees, and to employees of grades less than GS-11.   The re-assignments were made after the projects, which had been initiated and developed by GS-12 management analysts, had been fully implemented and required only maintenance rather than further development.   (Id. at ¶¶93-94)   Mr. Hindman testified that he was aware and approved of this practice.   (ECF No. 27-2 at Gov471-72.)   Ms. Hilton testified that she routinely made such reassignments in order to equalize workloads and more efficiently utilize her staff.   Plaintiff alleged, and Ms. Hilton agreed, that she may have assigned more of these "formerly GS-12" duties to Plaintiff.   Ms. Hilton testified that she did so because she believed that Plaintiff was "underutilized" and did not have sufficient work to keep her busy for a forty-hour work week.   (Id. at Gov521-24).   In addition, Ms. Hilton testified that NARA employees at all grades routinely perform duties that might be deemed appropriate for other grades.   She observed that so long as out-of-grade duties do not consume more than fifty percent of an employee's work time, this situation does not present a basis for re-classification.

Plaintiff also alleges that she requested, and was denied, an "accretion of duties" promotion on the basis of these assignments.   She asserts that such a promotion was appropriate, because

over the course of several years, she had been assigned ten projects that previously had been performed by GS-12 analysts.   (ECF No. 27-11 at 25)   The record indicates that two white employees received "accretion of duties" promotions during the relevant time period, but those promotions had not gone to GS-11 analysts, and there is no evidence that the assignment of "formerly GS-12" duties had been the impetus for the promotions.

### C.   *Delayed Desk Audit / Position Description Review (Count IV)*

With respect to Plaintiff's allegation that, on account of her race and skin tone, she was not given a timely desk audit and/or review of her position description, the record indicates that in May of 2007, Plaintiff e-mailed[10] Ms. Hilton requesting a position upgrade.   See (ECF No. 27-2 at Gov455-64)   Ms. Hilton responded by providing Plaintiff with a draft revision of her position description suggesting changes Ms. Hilton believed were appropriate.   Ms. Hilton testified that in her opinion, the proposed changes did not warrant assigning Plaintiff a higher pay grade.   (Id.) Plaintiff responded with numerous proposed revisions, but did not receive a response from Ms. Hilton.   It is undisputed that, after providing Ms. Hilton with proposed revisions, Plaintiff did not follow up with her, by way of e-mail or other written communication regarding the proposed revisions, until November 20, 2008.   Ms. Hilton testified that the press of other responsibilities had prevented her from addressing Plaintiff's proposed revisions, and that when she received Plaintiff's follow-up inquiry almost eighteen months later, she was in the process of completing Plaintiff's performance evaluation.   (ECF No. 27-2 at Gov457-58)

Four days later, on November 24, 2008, when no further action had been taken, Plaintiff sent Mr. Hindman a request for review of her position description.   (Id. at Gov458); (ECF No.

---

10      Plaintiff testified that she had first asked Ms. Hilton for a position review in February of 2006.   Plaintiff testified that when she received no response from Ms. Hilton, she forwarded her request to the "Archivist" and sent a copy to Ms. Hilton.   Ms. Hilton denied knowledge of either request, and the initial request is not part of the record.

27-11 at 20)   Mr. Hindman directed Plaintiff to confer with Ms. Hilton to see if she agreed that a review of the position description was warranted.   (ECF No. 27-2 at Gov458)   He explained that if Ms. Hilton did not agree, Plaintiff could then appeal to him and should provide documentation to support her position.   (Id.)   Plaintiff testified that following this communication from Mr. Hindman she took no further action because she had already given him documentation to support her position.   (Id. at 459)   She acknowledged that she did not, at that time or at any other time, remind Mr. Hindman that she previously had provided him with documentation.   (Id.)

At some point between July and September of 2009, NARA mandated an agency-wide revision of position descriptions, and Ms. Hilton informed Plaintiff and her co-workers that they should provide Mr. Marsh, who had been assigned to gather data for the GS-11 revisions, with all relevant information regarding their duties and position descriptions.   (ECF No. 27-11 at 22)   Plaintiff objected to Mr. Marsh's role in this matter, and it is undisputed that she never provided him with any information regarding her duties or position description.   (Id.)   Despite Plaintiff's failure to take action, Ms. Hilton subsequently submitted a draft position description and a request for a desk audit of Plaintiff's position to the Office of Personnel Management (OPM).   (Id.)

On June 2, 2010, a new position description was issued for all GS-11 management analysts, but the position remained at the GS-11 paygrade.   Thereafter, Ms. Hilton informed Plaintiff that if she desired a desk audit with respect to the new position description, she needed to file a request with the OPM.   Plaintiff testified that she did not do so because she believed that the new position description was inaccurate and therefore, that a desk audit would be futile.   (ECF No. 27-2 at Gov456-57)   On September 15, 2010, Ms. Hilton requested another desk audit on Plaintiff's behalf.

The record establishes that during the time period relevant to Plaintiff's complaint, the

position descriptions of other GS-11 management analysts were, like Plaintiff's, outdated. (DSOF at ¶116)   The record also indicates that the position description of one white, GS-11 management analyst was updated during the time that Plaintiff was awaiting her requested review. The record does not indicate what circumstances prompted the review, whether the employee had requested the review, and if so, whether he had followed the prescribed procedures for seeking review.   (ECF No.27-11 at 20)

### D.    *Delayed and Inaccurate Performance Evaluations (Count V)*

#### 1.    <u>The 2007 Evaluation</u>

Plaintiff also alleges disparate treatment on account of race and color arising from delay in the issuance of her performance evaluation for the period October 1, 2007 through September 30, 2008 ("the 2007 evaluation").   (<u>Id</u>. at 26)   The record indicates that Ms. Hilton completed and signed the 2007 evaluation in late November of 2007, but did not share it with Plaintiff until April of 2008.   Ms. Hilton rated Plaintiff "highly successful."   Ms. Hilton also failed to discuss her 2007 evaluations with two other employees, one black and one white, until April of 2008.   She acknowledged that she was responsible for all of the delays and admitted that in the past she had often been late in sharing performance evaluations with her employees.   She denied that her delay in discussing Plaintiff's evaluation was discriminatory.   The record contains no direct evidence of disparate treatment in this regard, and indicates, at most, that Ms. Hilton had a persistent weakness as a manager – failure to file timely performance evaluations on behalf of many of her employees.

It is undisputed that Plaintiff experienced no financial injury as a result of the delayed evaluation.   She asserts, however, that she was harmed by the delay because she had less time than white, GS-11 management analysts to improve on any weaknesses or criticisms noted in the evaluation.   (ECF No. 27-11 at 26)   It is undisputed that Plaintiff received a "highly successful"

performance rating in 2008 as well as in 2007 and had received the same rating every year since 2004.

## 2. The 2008 Evaluation

On November 21, 2008, Ms. Hilton signed and discussed with Plaintiff her 2008 performance evaluation. Ms. Hilton rated Plaintiff's performance "highly successful." (ECF No. 27-2 at Gov548-49); (DSOF at ¶137).

Plaintiff identifies four alleged inaccuracies in her 2008 performance evaluation and contends that Ms. Hilton included these inaccuracies in the evaluation in retaliation the filing of Plaintiff's EEOC charge. The record indicates that Ms. Hilton did not learn that an EEOC complaint had been filed until November 25, 2008, several days after she had completed and discussed Plaintiff's evaluation with her. (DSOF at ¶136) Moreover, it is undisputed that when Ms. Hilton first received notice of the complaint on November 25, the complainant was not identified. Ms. Hilton did not learn the identity of the complainant until early January, 2009.

With respect to the alleged inaccuracies[11] contained in the 2008 evaluation, Ms. Hilton testified that, even if the statements Plaintiff identified as inaccurate were in fact inaccurate, changing them would not have altered the performance rating Plaintiff had received. In addition,

---

[11] Plaintiff complained of the following inaccuracies: Ms. Hilton stated in the evaluation that Plaintiff had completed eighteen reports during the evaluation period, but Plaintiff asserted she had completed thirty reports. The discrepancy stems from the fact that Plaintiff used a different method for counting the number of completed reports than the one Ms. Hilton employed for all employees, including Plaintiff. Plaintiff further asserted that Ms. Hilton failed to give her credit for an education session she conducted. Ms. Hilton acknowledged that she failed to include the education session in the evaluation, but noted that Plaintiff had not recorded it in a timely manner. Plaintiff also objected to Ms. Hilton's description, within the evaluation, of one of Plaintiff's responsibilities as "PMRS liaison," rather than "PMRS administrator." (ECF No. 27-9 at 9-10); (ECF No 27-11 at 29) Finally, Plaintiff objected to a criticism contained in the evaluation that she failed to perform an assigned project related to ARCIS. Plaintiff asserted that she did not have the system access or training necessary to complete the task. Ms. Hilton testified that she had expected Plaintiff to show initiative by seeking the access and training necessary to complete the task. (ECF 27-11 at 31)

the record shows that Plaintiff reported the perceived inaccuracies to Ms. Hilton and to Mr. Hindman, but thereafter failed to pursue the formal process for appealing performance evaluations.  (ECF No. 27-11 at 29-31).

### E.      *Out - of - Town Training Sessions (Count VI)*

The record demonstrates that certain white employees, some of whom were GS-11 analysts, and some of whom also worked with the ARCIS system, attended out-of-town ARCIS training sessions.   The undisputed facts show that the Plaintiff did not remember if she asked to go to this training and did not know if she had the skills or would have benefited from the training. And she did not know what the training consisted of. (DSOF ¶¶160-163).   In addition, Plaintiff offers no competent evidence indicating that the employees who attended the training sessions had the same level of experience and facility with the ARCIS program as she did.

## II.    <u>Standards of Review</u>

### A.      *Summary Judgment*

Defendant moves to dismiss the allegations of Plaintiff's complaint for failure to state a claim for relief, or, in the alternative, for summary judgment.   Under the federal rules of civil procedure and applicable Eighth Circuit case law, once the Court considers matters outside of the pleadings, any motion to dismiss is converted to a motion for summary judgment. <u>See</u>, Fed. R. Civ. P. 12(b)(6); <u>Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.</u>, 187 F.3d 941, 948 (8th Cir. 1999) ("Rule 12(b)(6) itself provides that when matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.").   Because the court has considered matters clearly outside of the pleadings, including exhibits not contained in the initial pleadings and arguments of the parties in their extensive briefing, all of Defendant's motions will be treated as Rule 56 motions for summary

judgment.

Plaintiff also moves for summary judgment, but this fact does not alter the Court's analysis here because "[t]he usual Rule 56 standard applies to cross-motions for summary judgment." Int'l B'hood of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc., 293 F.3d 402, 404 (7th Cir. 2002).

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] Fed.R.Civ.P. 56 (a). "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation omitted). The nonmoving party, however, "may not rest" upon the allegations of the complaint, "but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). That showing requires more than "'[a] mere scintilla of evidence.'" Pedersen v. Bio-Medical Apps. of Minnesota, 775 F.3d 1049, 1053 (8thCir. 2015) (quoting Brunsting v. Lutsen Mountains Corp., 601 F.3d 813, 820 (8th Cir. 2010) (internal quotation and citations omitted)). And, if "'a nonmoving party who has the burden of persuasion at trial'" fails to "present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." Id. (quoting Brunsting, 601 F.3d at 820 (8th Cir. 2010)). Moreover, "a disputed fact alone will not defeat summary judgment, rather there must be a genuine issue of material fact." Torgerson v. City of Rochester, 643 F.3d 1031, 1052 (8th Cir. 2011) (en banc) (citing Liberty Lobby, 477 U.S. at 247-48). "To be material, a fact 'must affect

---

12      Here, the Court addresses the arguments raised from the perspective of Defendant's motion and thus places the burden on Defendant to demonstrate the absence of a genuine, material factual dispute. See Fed.R.Civ.P. 56(a) (providing that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law).

the outcome of the suit under the governing law.'" Id. (quoting Liberty Lobby, 477 U.S. at 248).

Finally, in reviewing a motion for summary judgment, the court must refrain from "[c]redibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (internal quotation

omitted). These are functions reserved for the jury alone. Id.

### B.  Disparate Treatment and the McDonnell Douglas Burden-Shifting Analysis

Title VII prohibits all discrimination in employment based upon race, sex, and national

origin. See Torgerson, 643 F.3d at 1043 (citing 42 U.S.C. § 2000e–2(a)(1)). Plaintiff offers no

direct evidence to support her claims of discrimination,[13] and therefore, the Court will analyze her

claims under the "burden-shifting framework" outlined in McDonnell Douglas Corp. v. Green,

411 U.S. 792, 802-03 (1973).

Under that framework, a plaintiff must first establish a *prima facie* case of discrimination,

showing that she: "'(1) is a member of a protected class; (2) was meeting her employer's legitimate

job expectations; (3) suffered an adverse employment action; and (4) was treated differently than

---

13    As the Eighth Circuit explained in Torgerson,

> Direct evidence in this context is not the converse of circumstantial evidence . . . .
> Rather, direct evidence is evidence "showing a specific link between the alleged
> discriminatory animus and the challenged decision, sufficient to support a finding
> by a reasonable fact finder that an illegitimate criterion actually motivated" the
> adverse employment action. Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64,
> 66 (8th Cir.1997). Thus, "direct" refers to the causal strength of the proof, not
> whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence
> that illegal discrimination motivated the employer's adverse action does not need
> the three-part McDonnell Douglas analysis to get to the jury, regardless of whether
> his strong evidence is circumstantial. But if the plaintiff lacks evidence that
> clearly points to the presence of an illegal motive, he must avoid summary
> judgment by creating the requisite inference of unlawful discrimination through the
> McDonnell Douglas analysis, including sufficient evidence of pretext. See, e.g.,
> Harvey v. Anheuser–Busch, Inc., 38 F.3d 968, 971 (8th Cir.1994).

Torgerson, 643 F.3d at 1044.

similarly situated employees who were not members of her protected class.'" Rebouche v. Deere & Co., 786 F.3d 1083, 1087 (8th Cir. 2015) (quoting Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir.2013)).

If plaintiff presents a *prima facie* case of discrimination, the burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Torgerson, 643 F.3d at 1047 (internal quotation omitted). "If defendant meets that minimal burden, plaintiff must show that the proffered nondiscriminatory reason is merely a pretext for unlawful . . . discrimination.'" Fiero v. CSG Systems, Inc., 759 F.3d 874, 878 (8th Cir. 2014) (quoting Putman v. Unity Health Sys., 348 F.3d 732, 735 (8th Cir.2003)).

A plaintiff may prove pretext by "adducing enough admissible evidence to raise genuine doubt as to the legitimacy of [the defendant's] motive." Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 521 (8th Cir. 2010) (internal quotation and citation omitted). And "[w]here [as here] . . . the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision." Torgerson, 643 F.3d at 1049 (internal quotation omitted); see also Hilde v. City of Eveleth, 777 F.3d 998, 1007 (8th Cir. 2015) (holding, in an ADEA case, that comparative analysis of the qualification is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision).

"[T]here are 'at least two routes' for demonstrating a material question of fact as to pretext." Anderson, 606 F.3d at 521 (citing Wallace v. DTG Operations, Inc., 442 F.3d 1112,

1120 (8th Cir.2006)).   "First, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact.   Second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer."   Id.   (internal quotation and citation omitted).   Also, a plaintiff may demonstrate pretext by showing "that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."   Gibson v. American Greetings Corp., 670 F.3d 844, 854 (8th Cir. 2012) (quoting Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010)).

## III.   Discussion

Here, with respect to each of her claims, Plaintiff, as an African American employee who was meeting her employer's expectations, has successfully established the first two elements of the *prima facie* case.   The remaining aspects of the McDonnell Douglas analysis are discussed below with regard to each claim.

### A.   *Counts I and II; Failure to Promote*

For purposes of Counts I and II, her claims for failure to promote, Plaintiff has also established the third element of the *prima fac*ie case – that she suffered an adverse employment action.   See AuBuchon v. Geithner, 743 F.3d 638, 643 (8th Cir. 2014) (identifying failure to promote as an "adverse employment action").

Turning to the fourth element of the *prima facie* case, that Plaintiff was treated differently than similarly situated white employees, the Court notes that "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous," Torgerson, 643 F.3d at 1047, but "the plaintiff must be able to produce some evidence of similarity between her and her comparator." Rebouche, 786 F.3d at 1088-89.   Moreover, "[i]f the comparison 'reveals that the plaintiff was

only similarly qualified or not as qualified as the selected candidate,' then no inference of ... discrimination would arise." Torgerson, 643 F.3d at 1049 (quoting Wingate v. Gage County Sch. Dist., 528 F.3d 1074, 1080 (8th Cir. 2008) (internal quotation omitted)).

Plaintiff offers only limited and conclusory factual support for her contention that she and the selected candidates were similarly situated. See (ECF No. 27-2 at Gov417 to Gov424); see also Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1311 (8th Cir.1995) (observing that "[a]lthough [an employee] does possess the experience and some of the other qualities essential for success in the position, this does not suffice to raise an inference that [the employer's] stated rationale for giving the position to another is pretextual"). Nevertheless, the Court may—and for the limited purpose of this case will—assume that Plaintiff has established this element of her *prima facie* case. See, e.g., Gibson, 670 F.3d at 854 (assuming that plaintiff had established a *prima facie* case and proceeding directly to analysis of the discrimination claim under the pretextual prong of the McDonnell Douglas framework).

The burden therefore shifts to Defendant to offer a legitimate, nondiscriminatory justification for the alleged discriminatory action. See Jackson v. United Parcel Serv., Inc., 643 F.3d at 1086 (explaining that, "the defendant may rebut the *prima facie* case by articulating a non-discriminatory rationale for its action"). In this case, Defendant contends that the candidates selected were more qualified for the open positions because they had stronger communication and analytic skills than Plaintiff and more pertinent experience, especially with respect to the information technology requirements for the job. Further, it is undisputed that Plaintiff scored lower than both of the individuals who got the job in the eyes of all three of the interviewers, who independently and blindly ranked each of the candidates interviewed. The reasons given by NARA for choosing the two individuals who got the job over Plaintiff suffice to discharge the

burden of the defendant at this stage of the analysis.

At the next stage of the analysis, a plaintiff, in order to prevail, "must prove that the defendant's proffered rationale was merely pretext for discrimination." Torgerson, 643 F.3d at 1047. At the pretext stage, "the evidence is viewed in light of the employer's justification," and the plaintiff "must show that the employer's proffered reason is unworthy of credence." Ebersole v. Novo Nordisk, Inc., 758 F.3d 917, 925 (8th Cir. 2014) (internal citation and quotation omitted). Put simply, for purposes of this case, "to support a finding of pretext, [Plaintiff] must show that [NARA] hired a less qualified applicant." Torgerson, 643 F.3d at 1049.

Upon review of the record, the Court concludes that Plaintiff has failed to offer evidence from which a reasonable jury could find that the selected candidates were less qualified than Plaintiff and that NARA's actions were merely pretext for discrimination. It is undisputed that the selected candidates had stronger communication skills and more business analysis experience than Plaintiff, and that these were qualifications which Ms. Hilton deemed important for success in the GS-12 analyst positions. See Kincaid v. City of Omaha, 378 F.3d 799, 805 (8th Cir. 2004) (observing that the employment-discrimination laws have not vested federal courts with the authority to sit as "super-personnel departments reviewing the wisdom or fairness of business judgments," unless those judgments involve intentional discrimination; and therefore, that it is the employer's, not the court's, role to identify those strengths necessary for success in the position at issue); see also Torgerson, 643 F.3d at 1051 (noting a plaintiff has the burden to prove that she "'and the top applicants were 'similarly situated in all relevant respects' – a 'rigorous' standard at the pretext stage'") (quoting King v. Hardesty, 517 F.3d 1049, 1063 (8th Cir.2008)).

In light of the undisputed facts, no reasonable jury could find that Plaintiff was similarly situated in all relevant respects to the selected candidates. And no reasonable jury could find that

in hiring Mr. Marsh and Mr. Stewart, NARA hired candidates who were less qualified than Plaintiff.   At best, the record indicates that Plaintiff's qualifications were similar to those of the selected candidates; but "to support a finding of pretext, [the applicant] must show that [NARA] hired a *less* qualified applicant."   Torgerson, 643 F.3d 1049 (internal quotation omitted).   In addition, the record establishes that Plaintiff, rather than the selected candidates, was less qualified with respect to the skills that Ms. Hilton deemed crucial for success – written and verbal communication, initiative, and business operations analysis.   The fact that the assessment of these skills involved subjective elements does not vitiate their validity as a basis for the hiring decisions. Wittenburg v. Am. Express Fin. Advisors, Inc., 464 F.3d 831, 839 (8th Cir. 2006) (holding that 'the presence of subjectivity in employee evaluations is itself not a grounds for challenging those evaluations as discriminatory").   Thus, no reasonable jury could find that Defendant's reasons for promoting Mr. Marsh and Mr. Stewart were a pretext for discrimination on the basis of race or color.   Therefore, Plaintiff's arguments do not create a material issue of fact as to pretext and the defendant is entitled to summary judgment on Counts I and II.

###### B.      Count III

In Count III, Plaintiff alleges that she was assigned "GS-12 projects" but paid at the GS-11 pay grade, and that other white, GS-11 management analysts received no, or significantly fewer, "GS-12 projects."   To the extent that Plaintiff alleges she has not been properly compensated for the work she performs, she satisfies the third element of the *prima facie* case.   Jackman, 728 F.3d at 804 (stating that a "material employment disadvantage" constitutes an "adverse employment action").

Proceeding to the next element, the Court will assume, without deciding, that Plaintiff has established that she and the white, GS-11 management analysts were similarly situated.   See, e.g.,

Gibson, 670 F.3d at 854 (assuming that plaintiff had established a prima facie case and proceeding directly to analysis of the discrimination claim under the pretextual prong of the McDonnell Douglas framework). The burden then shifts to Defendant to offer a legitimate, nondiscriminatory reason for the work assignments and compensation Plaintiff received. Here, the undisputed facts show that the reassigned tasks had initially been given to GS-12 analysts when they were in the development stage; but that as the projects moved out of the development stage, they became less complex and were appropriate for maintenance by GS-11 analysts. (DSOF at ¶¶93-95). Further, the defendant reassigned GS-12 work to all four of her GS-11 Management Analysts, including one white male and two white females. (Id. at ¶96) Defendant also offers evidence that such projects were not "GS-12 projects," warranting an increase in pay grade.[14] Moreover, undisputed evidence indicates that although Plaintiff may have received more of these types of projects than the white, GS-11 analysts did, Ms. Hilton assigned these projects because she believed Plaintiff was under-utilized and needed additional work.

With respect to Plaintiff's compensation, Plaintiff has not presented any evidence, other than her own unsubstantiated allegations, to demonstrate that due to the nature of the projects she was assigned she should have been paid at the GS-12 grade or that Ms. Hilton's explanation of the way in which projects were assigned was not based in fact. See Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir.1994) (affirming summary judgment on race discrimination claims where plaintiff presented no evidence "other than his own unsubstantiated allegations in deposition[,]" and concluding that "[i]n light of plaintiff's failure to adduce any independent evidence to substantiate his disparate treatment claim, we agree with the district court that there is no genuine issue of fact on the issue of pretext") (internal citation and quotation omitted)).

---

14    In addition, there is no evidence that assigning Plaintiff a project or projects requiring "GS-12-level" skills should have triggered an increase in her pay grade.

Moreover, there is no indication in the record that Defendant's explanation lacks a basis in fact, changed over time, or was contrary to NARA's own policies.   See Anderson, 606 F.3d at 521.   And despite Plaintiff's repeated assertions that there is no other explanation apart from discrimination, this is not a case where "all legitimate explanations have been eliminated as possible reasons for the employer's actions."   See Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978) (explaining that when all legitimate explanations "have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reasons, based [its] decision on an impermissible consideration such as race").   Apart from her own self-serving testimony, Plaintiff offers no evidence even tending to show the absence of a reasonable explanation for Defendant's actions in assigning projects.   Therefore, the Defendant is entitled to summary judgment on Count III.

## C.    Counts IV, V, VI and VII Adverse Employment Actions

Turning to the remaining claims, the Court concludes that Plaintiff fails to establish that the wrongs asserted in Counts IV, V, VI and VII and in the retaliation claim[15] constitute "adverse employment actions;" and therefore, has not adduced sufficient evidence to establish a prima facie case with respect to these claims.

For purposes of discrimination claims under Title VII, an "adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that

---

15    The wrongs asserted in these counts are: (1) failure to give Plaintiff a timely position description review or upgrade; (2) the delay in her receipt of the 2007 performance evaluation; (3) that she was not selected, or offered the opportunity, to attend out-of-town computer training; (4) that the other GS-11 management analysts with whom she worked received less demanding work projects than she did; and (5) that Ms. Hilton retaliated against Plaintiff by making inaccurate statements in her 2008 performance evaluation.

affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge."   Jackman, 728 F.3d at 804   "However, minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action."   Id.   For example, a negative performance review, without more, does not constitute an "adverse employment action," as required for a *prima facie* case under Title VII, "unless the review was relied on in making promotion decisions about the employee."   Rebouche, 786 F.3d at 1088 (citing Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir.2005)).

Applying these principles here, the Court concludes that Plaintiff offers no meaningful evidence to show she suffered a "materially significant disadvantage" as the result of any of the actions alleged in Counts IV-VII or in her claim of retaliation.   Jackman, 728 F.3d at 804.   For example, there is nothing in the record indicating that either the delayed position description or 2007 performance evaluation affected Plaintiff financially.   It is undisputed that neither of these delays prevented Plaintiff from receiving or delayed her receipt of raises or grade increases.   In addition, the record indicates that when the position description upgrade was finally completed it had no impact on Plaintiff's existing pay grade.   Similarly, Plaintiff offers no admissible evidence that attendance at out-of-town training was necessary for advancement or that it would have affected her performance ratings, raises, or pay grade.

With respect to the nature of the projects assigned to Plaintiff, the only evidence of disadvantage is Plaintiff's own testimony that she was unable to be away from the office as much as other GS-11 analysts who had less "mission-critical" assignments.   She did not, however, offer evidence that she was not permitted to take leave, and in fact, made several references in her testimony to extended periods of leave she took during the time period relevant to this suit.

24

Drawing all reasonable inferences in Plaintiff's favor, the Court nonetheless concludes that the assignments Plaintiff received were, at most, "unwelcome or unpalatable." Id. No reasonable jury could find that Plaintiff suffered a material disadvantage as a result of the types of projects she was assigned. Therefore, even if the Court assumes, as Plaintiff asserts, that white GS-11 analysts received less demanding work assignments than she did, she offers no evidence that she suffered an adverse employment action as a result of her assignments. It is also undisputed that the allegedly inaccurate statements did not affect the performance rating she received or that the performance rating had, or could have had, an impact on her compensation. Moreover, Ms. Hilton testified that even if the allegedly inaccurate statements had been changed or deleted in accordance with Plaintiff's objections, Plaintiff's performance rating would not have changed.

Therefore, the Court concludes that Plaintiff has not come forward with sufficient evidence to indicate that wrongs alleged in Counts IV, V, VI, VII and in the retaliation claim amount to adverse employment actions. In the absence of such evidence, Plaintiff cannot establish a *prima facie* case of discrimination with respect to these claims, and Defendant is entitled to summary judgment thereon.

### D. *Retaliation*[16]

Title VII makes it unlawful for an employer to discriminate against an employee because she has "made a charge, testified, assisted, or participated . . . in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). The "employee has the initial burden of establishing a *prima facie* case of retaliation by showing that (1) [s]he engaged in protected conduct, (2) [s]he suffered a materially adverse employment action, and (3) the adverse action was

---

16    As noted above, Plaintiff has not explicitly pled a count charging retaliation with respect to her 2008 performance evaluation, but in light of the Court's commitment to broadly construe this *pro se* complaint, the allegations in Plaintiff's EEOC complaint, and her deposition testimony, the Court has considered a retaliation claim as a possible basis for relief.

causally linked to the protected conduct." <u>Pye v. Nu Aire, Inc.</u>, 641 F.3d 1011, 1021 (8th Cir. 2011). The "ultimate question" is "whether the employer's adverse action against the employee was motivated by retaliatory intent." <u>Tyler v. Univ. of Ark. Bd. of Trustees</u>, 628 F.3d 980, 985 (8th Cir. 2011) (quotation omitted).

In this case, an alternative ground for granting summary judgment on Plaintiff's retaliation claim is the undisputed fact that at the time that Ms. Hilton completed Plaintiff's performance evaluation, Ms. Hilton was not aware that Plaintiff had filed an EEOC complaint. Absent evidence establishing a causal connection between the adverse action, alleged inaccuracies in the 2008 performance evaluation, and Plaintiff's EEOC complaint, Plaintiff cannot establish a *prima facie* case of retaliation. And even if she could, Defendant has offered a legitimate, nondiscriminatory explanation for the alleged inaccuracies, which Plaintiff has not countered or in any way disproved as pretext. Therefore, to the extent that Plaintiff's complaint may be construed to allege a claim of retaliation, the Court concludes that Defendant also is entitled to summary judgment with respect to her claim of retaliation.

Accordingly,

**IT IS HEREBY ORDERED t**hat Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment is **GRANTED**. (ECF No. 26)

**IT IS FURTHER ORDERED t**hat Plaintiff's Motion for Summary Judgment, or

Alternatively, Referral to ADR is **DENIED**.   (ECF No. 29)

A separate Judgment shall accompany this Memorandum and Order.


Dated this  _30th_  day of July, 2015.



       /s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE